STORMS *v.* STATE.

Opinion delivered April 22, 1929.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

MEHAFFY, J. The appellant was indicted for murder in the second degree for the killing of Arch Bean, on November 1, 1926. He was tried, found guilty of voluntary manslaughter, and his punishment fixed at four years in the penitentiary. The appellant filed a motion for new trial, alleging that the verdict was contrary to the law and evidence, and that the court erred in giving instructions numbered 1 to 23, inclusive. His motion for new trial was overruled, exceptions saved, and he prosecutes this appeal to reverse the judgment of conviction.

Dr. R. M. Stanley testified that he was called to see Arch Bean; that Bean had a fracture of the skull, and he called in Drs. Gray, W. R. Hunt and Earl Hunt;

that there were three distinct fractures from the blow; the wound was inflicted with a blunt instrument, and the character of the wound would indicate that he had been hit by some one above him; that Bean died the next morning, from the effects of the wound.

J. W. Bean, father of Arch Bean, testified in substance that Arch Bean was 34 years old; lived about a quarter of a mile from him, and was at witness' house on the morning of the day he was killed, and then came to his father's house again in the afternoon, and had been there about ten minutes when Cecil Storms came. Storms was invited in, but said he didn't have time. Storms asked Arch if he wanted to take a squirrel hunt, and Arch agreed to go, and they went off south through the woods. Arch Bean was married, and had a wife and six children. Witness had never heard of any trouble between Arch and Cecil.

Mrs. J. W. Bean, mother of Arch Bean, also testified about Cecil Storms coming to their house, and about him and her son talking together.

Mrs. A. M. Bean, wife of the deceased, testified that she was the sister of defendant, Storms, and that she saw Storms standing at the front door the day her husband was killed, and he said to her, "Arch is hurt." When she asked Storms who hurt him, he said he did, that he hit him with a gun. Witness asked Storms to show her the way to where Arch was, and he acted like he was going to shoot all of them. He did not take witness to where her husband was, but a Mr. Beavers heard them screaming, and came to them, and Cecil then left. Mr. Beavers went down the road, and found Arch there; found him about a quarter of a mile from the house. Storms had visited them at their house up to a year before the killing, but neither he nor his wife had visited them up to within a year prior to the killing. Storms had applied to witness' husband for a loan of $800 about a year before the killing, and witness objected to his making the loan.

Dr. W. R. Hunt also testified about the death resulting from the injury received on the side of deceased's head.

E. Crumline, the undertaker, testified that he prepared the body of Arch Bean for burial, and that his back and shoulder looked like they were bruised, and black and blue. Besides this bruise, witness did not notice any other wounds, except on his head.

Oscar Sears, another witness, testified about the wounds and the killing.

I. C. Bean testified about the place where they found Arch Bean, and about noticing blood on the hillside.

Ed Ogden testified about carrying the body from the hill to the home, about there being dark-looking streaks on his back.

Some other witnesses testified also about what Storms said.

Ed Edwards, a deputy sheriff, testified for the defendant; that he went and arrested Cecil; that when he got there Cecil was crying; that they brought him to town, and he related the circumstances to them.

Buddie Sanders, also a witness for the defendant, testified about being with them when they went hunting, and stated that he heard the deceased say to Storms that it was a damned lie, and saw him throw up his gun, and that Cecil struck him down; that witness then ran, and did not see any more of it.

L. A. Sanders also testified in behalf of appellant.

Appellant himself testified, denying all the statements that his sister had made about borrowing money, and also testified that the deceased had been to his house and insulted his wife, and also testified about going by the home of deceased's father and finding him there; that he intended to go to deceased's house and mention the matter about deceased insulting his wife, but he concluded to mention the matter to him before, and that when he did, deceased said, "It is a damn lie, and I will shoot you." When he did that, he struck deceased, but

did not intend to hurt him much. He testified also at length about going by his sister's, and what was said; but we deem it unnecessary to review all the testimony here. The killing is admitted by the appellant, and the evidence is ample to sustain the verdict. The jury might have found appellant guilty on his own testimony.

As said in the case of *Vaden* v. *State*, 174 Ark. 950, 298 S. W. 323: "The jury might have found, from appellant's own testimony, that he acted hastily in taking the life of deceased. The jury was warranted in finding that appellant voluntarily and unnecessarily engaged in the rencounter with Lawrence Harris which resulted in the death of Harris. It was purely the province of the jury to determine, under the evidence, the innocence or guilt of the appellant." *Bruder* v. *State*, 110 Ark. 402, 161 S. W. 1067; *McGough* v. *State*, 119 Ark. 57, 177 S. W. 398.

In the instant case, however, the jury may have disbelieved appellant's story about how the difficulty occurred. The testimony of the State's witnesses, some of them, tends to show that the appellant had got angry because deceased had refused to lend him money, and appellant's own testimony shows that he intended to see deceased and ask him about insulting his wife; that that was his purpose in wanting to see the deceased. Then the undisputed proof shows that he was struck on the back and on the right side of his head, above the ear. The doctor testified that the wound indicated that he had been hit from above.

This court does not pass on the weight of evidence nor on the credibility of the witnesses. This is the province of the jury; and the rule is well settled by the decisions of this court that, in determining the legal sufficiency of evidence to support the verdict, it must be considered in the light most favorable to the State. *Moore* v. *State*, 167 Ark. 164, 267 S. W. 769; *Campbell* v. *State*, 170 Ark. 936, 282 S. W. 4; *Pierce* v. *State*, 176 Ark. 1205, 4 S. W. (2d) 948.

The appellant also contends that the court erred in giving instructions numbered 1 to 23 inclusive. The court instructed the jury fully on every issue in the case, and the court did not refuse to give any instructions requested by appellant. The instructions are quite lengthy, and we deem it unnecessary to set them out or discuss them in this opinion. We have carefully examined all the instructions, and have reached the conclusion that the charge of the court was correct.

Finding no error, the judgment is affirmed.