WILLIS *v.* STATE.

4704                                    251 S. W. 2d 816

Opinion delivered October 20, 1952.

*N. A. McDaniel, O. Wendell Hall, Jr., W. A. Waddell* and *C. Van Hayes,* for appellant.

*Ike Murry,* Attorney General, and *George E. Lusk, Jr.,* Assistant Attorney General, for appellee.

ROBINSON, J.   This appeal is from a conviction for murder in the second degree and a sentence thereon of 12 years in the penitentiary.   Appellant Willis is the son-in-law of Doc Cooper whom he shot and killed.   Appellant's wife, the daughter of Cooper, had gone to her

father's home after some difficulty with appellant who followed her there. Cooper told appellant to leave, which he did, but returned with Cooper's shotgun, which he had previously borrowed, and his own shotgun. He threw Cooper's gun, which was not loaded, into the yard. Cooper came out of his house. However, he did not pick up the gun but picked up an axe handle and started toward appellant, who then shot and killed Cooper.

The evidence would justify a finding that appellant threw Cooper's empty gun into the yard anticipating that Cooper would pick it up, appellant intending to kill Cooper and then claim self-defense.

Before the selection of the jury had been completed, counsel for defendant made the following motion: "We ask for the original list of all the jurors who have been summoned here and object to proceeding further until we can see that list."

The Court: "The defense counsel shall be given a copy of all the jurors who have been summoned and a copy is now in court and available to them."

Defense counsel: "Then the court denies us the right to see the original before we proceed further— signed by the commissioners?"

The Prosecuting Attorney: "Let the record show that they have a copy of the original that is going to be worked on at this time, and a copy of the alternates will be furnished them before they will have an opportunity to either accept or reject."

The Court: "Yes, let the record show that the defense counsel will be given ample opportunity to see an original list of the alternates which they do not have at this time, but they will be given an ample opportunity to see the original list before any names are drawn from that list."

Thus, it appears from the record that counsel's request for the list of all the jurors who had been summoned was granted and not refused. Appellant complains of being compelled to proceed with the selection

of the jury although all of the 28 special veniremen selected by the jury commissioners had not been summoned and were not in court. The Sheriff was unable to serve all of those named on the list and those that the Sheriff was unable to serve were excused by the court. The Prosecuting Attorney offered to put on evidence to prove that the Sheriff had served those on the list to the very best of his ability, and he had not deliberately served only certain ones. Counsel for defense stated that they were not raising such question.

If the court could not proceed with the trial of a defendant until all of those named in the list selected by the jury commissioners had been served and were in court, then it might be impossible to ever try a defendant.

In the case of *Moore* v. *State,* 9 Okla. Cr. 9, 130 Pac. 517, the Supreme Court of Oklahoma said: ''The law is thus stated in 24 Cyc. 254, 'where some of the jurors summoned fail to appear, it is not necessary, in the absence of Statute, for the court to delay the impaneling of the jury or postpone the trial; nor is it necessary for the court to have other jurors summoned to fill the places of those who are absent, or to issue attachment for the absent jurors'.''

''In the trial of every criminal case, the non-attendance of some of the veniremen for unforeseen causes is to be expected. It is something that no human foresight can provide against, but it can never become serious, unless it can be shown that fraud has been committed or that a wrong has been worked on the defendant.'' *State* v. *Dallao, et al.,* 187 La. 392, 175 So. 4.

Mrs. LaUna Cooper testified that she was in defendant's home about 4:15 on the afternoon of the killing; that defendant sent his little boy out to the defendant's car to get a bottle of whiskey; that defendant's wife asked him not to have the boy carry the whiskey; that she got up from the table and went into the living room. No objection was made to the testimony up to this point. Then the following occurred:

"Q. Did the little boy go and get the whiskey?

"A. Yes, sir.

"Q. All right.

"A. And she went in the living-room and he was going to knock her in the head with the clock there at the table if she didn't hush.

"Q. If what?

"A. He was going to knock her in the head with the clock. He had the clock setting on the table by him.

"Q. If she didn't do what?

"A. If she didn't hush. So I went on in the living-room there where she was at, and he came on in and began to cussing her people, my husband and her brother, and he said they were the thievingest sons of bitches that ever hit Arkansas, and she went to crying and begging him not to—"

At that point defense counsel made the following objection: "Your Honor, I don't want her referring to what she said—I object to that." The objection was overruled.

Later, while the taking of testimony was still in progress, the court instructed the jury as follows: "Any statement by any witness regarding any statement which is alleged to have been made anytime by the wife of the defendant is hereby held by the court incompetent, and you are told to totally disregard such testimony."

In the first place, the testimony was admissible. It was not a statement made by defendant's wife, the truth or falsity of which would shed any light on the issue involved. It was more in the nature of an act in connection with the defendant's conduct in speaking of his wife's relatives in the vilest of terms. The statement of the defendant was admissible to show his frame of mind a short time before he killed his wife's father. In the second place, the court instructed the jury not to consider it.

The Prosecuting Attorney on cross-examination questioned the defendant about his drinking and asked:

"Q. Well, you got drunk on one occasion and had a wreck and killed a boy, didn't you?

"A. Well, that has been about 12 or 14 years ago."

In *DuVal* v. *State,* 171 Ark. 68, 283 S. W. 23, this court said: "It was competent for the State to cross-examine the accused concerning prior unlawful or immoral conduct, regardless of time, for the purpose of testing their credibility . . ."

In the case of *Whittaker* v. *State,* 171 Ark. 762, 286 S. W. 937, this court quoted from *Hollingsworth* v. *State,* 53 Ark. 387, 14 S. W. 41, as follows: "It has always been held that, within reasonable limits, a witness may,' on cross-examination, be very thoroughly sifted upon his character and antecedents. The Court has a discretion as to how far propriety will allow this to be done in a given case, and will or should prevent any needless or wanton abuse of the power. But, within this discretion, we think a witness may be asked concerning all antecedents which are really significant, and which will explain his credibility." A witness also includes the accused when he takes the witness stand. *Sullivan* v. *State,* 171 Ark. 768, 286 S. W. 939.

The defendant's daughter, Bonnie Faye, was a State witness, and testified that on the afternoon of the shooting she had seen her father's gun by a chair; that she picked it up and put it on some quilts between two chests; that she moved the gun because she was scared her father "would shoot some of us". Appellant contends this was opinion evidence and should not have been admitted. The fact that the little girl was afraid her father "would shoot some of us" was not an opinion. She was stating a fact that she was afraid, the evidence being that a short time before she moved the gun her father had threatened to kill her sister, Billy Jean. All of the facts which caused her fear had been introduced in evidence. Thus, it affirmatively appears that the statement could in no way be prejudicial to the defend-

ant. If the facts upon which her fear was based had not been put in evidence, the situation would be different.

In his argument to the jury, the Prosecuting Attorney asked why the defendant did not use his other son as a witness. This was not an improper argument. If the defendant had indicated that his son knew something of benefit to the defense and then did not use him as a witness, it would be perfectly logical for the Prosecuting Attorney to ask why he was not used. On the other hand, if the defendant had in no way indicated that his son had any information beneficial to the defense, the argument would be meaningless and could not be prejudicial.

The appellant also says that the court erred in permitting the Prosecuting Attorney to argue that the defendant "went purposely to his house and got both guns and loaded his own gun before he came by there and threw Doc's gun into the yard, in my opinion so Doc would come out and pick it up so that he could kill him in cold-blooded murder, and I believe that was his intention at the time."

It is perfectly proper for counsel to argue all inferences reasonably deducible from the evidence, and the evidence in this case justifies the argument made by the Prosecuting Attorney. As to the Prosecuting Attorney expressing his opinion in regard to the evidence, this court said in *Adams* v. *State,* 176 Ark. 916, 5 S. W. 2d 946: "But this court does not reverse for the mere expression of opinion of counsel in their argument before juries, unless so flagrant as to arouse passion and prejudice, made for that purpose, and necessarily having that effect."

Upon a review of the entire record we find no error.

Affirmed.